### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

**JTH TAX LLC,**

      **Plaintiff,**

**v.**                                                                                   **Civil Action No. 3:20cv176**

**DM3 VENTURES, INC.,** *et al.,*

      **Defendants.**

### MEMORANDUM OPINION

This matter comes before the Court on Defendants DM3 Ventures, Inc. d/b/a Whitewood

Tax Solutions ("Whitewood"), Liberty Tax Solutions, Inc. ("Liberty Tax Solutions"), and Darin

Branch's[1] (collectively, the "Defendants") Motion to Dismiss pursuant to Federal Rule of Civil

Procedure 12(b)(6)[2] (the "Motion to Dismiss"), (ECF No. 32), and Plaintiff JTH Tax LLC d/b/a

Liberty Tax Service's ("Liberty Tax") Amended Complaint, (ECF No. 31).[3]  Liberty Tax

responded to the Motion to Dismiss, (ECF No. 34), and Defendants replied, (ECF No. 35).

These matters are ripe for disposition.  The Court dispenses with oral argument because

the materials before it adequately present the facts and legal contentions, and argument would

---

[1] Liberty Tax had filed suit against Branch in his individual capacity as Whitewood's CEO.  (Am. Compl. ¶¶ 7–8.)

[2] Rule 12(b)(6) allows dismissal for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).

[3] Liberty Tax asks the Court in passing for a Preliminary Injunction in its Amended Complaint.  (Am. Compl. 24, ECF No. 31.)  The Court will deny this relief, as Liberty Tax fails to explain how Whitewood's continued use of "www.libertycanhelp.com" will irreparably harm it, how the balance of hardships tips in its favor, or how such an injunction would serve the public interest.  *See Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013).

not aid the decisional process.  The Court exercises jurisdiction pursuant to 28 U.S.C. §§ 1331[4] and 1367(a).[5]  For the reasons that follow, the Court will deny Defendants' Motion to Dismiss Counts I and III through V against Whitewood, but will grant the Motion to Dismiss Counts I and III through V against Branch in his individual capacity and Count II against all Defendants.[6]

## I.  Factual and Procedural Background

Liberty Tax centers its claims primarily around the Defendants' creation, ownership, and operation of the domain name "www.libertycanhelp.com" (the "Domain").  It brings this action asserting trademark infringement and related claims against the Defendants for their use of the Domain, including linking to the Domain near Liberty Tax's word and design trademarks on Whitewood's social media accounts and marketing pamphlets.  (Am. Compl. ¶¶ 8–17, ECF No. 31.)  Liberty Tax also argues that Whitewood infringed upon its trademark by displaying one of Liberty Tax's marks on a separate Whitewood website.

---

[4] "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.  Liberty Tax identifies its basis for jurisdiction as federal trademark law, 15 U.S.C. §§ 1051 *et seq*.  (*See* Am. Compl. ¶ 9.)

[5] The Court exercises supplemental jurisdiction over Liberty Tax's state law claims pursuant to 28 U.S.C. § 1367(a) ("[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy . . . .").  The Amended Complaint alleges trademark infringement pursuant to Virginia Code § 59.1-92.12 and common law unfair competition.  (*See id.* ¶¶ 118, 122.)

[6] Liberty Tax does not specifically aver that Liberty Tax Solutions, as a distinct entity from Whitewood, engaged in any allegedly unlawful conduct separate from Whitewood. *See* (Am. Compl. ¶ 8) (referring to DM3 Ventures and Liberty Tax Solutions collectively as "Whitewood").  To the extent Liberty Tax seeks to impose liability on Liberty Tax Solutions as a separate entity, the Court will dismiss each of those claims for failure to allege sufficient facts. *See* Fed. R. Civ. P. 8(a)(2).

## A.   <u>Factual Allegations</u>[7]

Liberty Tax operates as "a franchisor of Liberty Tax Service income tax preparation service centers located throughout the United States." (*Id.* ¶ 13.)  Accordingly, it owns several federally registered trademarks, service marks, and logos, as well as the "Liberty Tax Service system [that] sells income tax preparation and filing services [as well as] products to the public under its marks." (*Id.* ¶ 14.)

Liberty Tax owns the following trademarks in connection with tax preparation:  the "LIBERTY TAX" word mark,[8] the "LIBERTY TAX SERVICE" word and design marks,[9] and the "LIBERTY INCOME TAX" word mark.  (*Id.* ¶¶ 15–18.)  It also owns the "LIBERTY ACCOUNTING" word mark in connection with computer software and accounting services. (*Id.* ¶¶ 30–31.)  In addition to owning certain marks, Liberty Tax has *applied* for the following trademarks:  (1) a "LIBERTY TAX" design mark;  (2) a "LIBERTYTAX" design mark; (3) a "LIBERTY TAX & LOANS" design mark; (4) the "LIBERTY TAX CREDIT REPAIR" word mark; (5) the "LIBERTY TAX RESOLUTION" word mark; (6) the "LIBERTY TAX DEBT RESOLUTION" word mark; (7) a "LIBERTY AUDIT ARMOR" design mark; (8) the

---

[7]  For the purpose of the Rule 12(b)(6) Motion to Dismiss, "a court 'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff.'"  *Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cnty., Md.*, 684 F.3d 462, 467 (4th Cir. 2012) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 440 (4th Cir. 2011)).

[8]  A "word mark" is a trademark in the form of a specific word. *See* 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 11:8 (listing examples of "coined" word marks).

[9]  A "design mark" is a trademark in the form of a specific design. *See* 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:47 (depicting composite word and design marks).

"LIBERTY CREDIT REPAIR" word mark; and (9) the "LIBERTY TAX LOAN" word mark. (*Id.* ¶¶ 19–27, 29.)

In 2014, Liberty Tax and Whitewood, which provides tax resolution services to "help[] individuals or entities . . . with delinquent tax debt," (*id.* ¶ 37), formed a partnership in which "Whitewood would provide its complementary tax resolution services to Liberty Tax's franchisees." (*Id.* ¶ 38.)   Later that year, Whitewood registered the Domain to serve "as a vehicle to refer Liberty Tax consumers to Whitewood." (*Id.* ¶¶ 39–40.)  On some unalleged date, the two terminated their business relationship, but Whitewood continued to own and operate the Domain. (*Id.* ¶ 43.)

As of November 20, 2020, the date Liberty Tax filed its Amended Complaint, the Domain automatically redirected users to "www.yourtaxhelpteam.com," "another Whitewood-owned domain and associated website." (*Id.* ¶ 44.)  This website prominently displays Whitewood logos in the top left and center of the page, provides "info@whitewoodsolutions.com" as a contact email address, and notes that the site is a copyright of "Whitewood Tax Solutions." (Ex. 1 Am. Compl. 2, ECF No. 31-1.)  Nowhere on the website do Liberty Tax marks appear, and the site does not otherwise advertise an affiliation with the company. (*Id.*)

Whitewood maintains another website aside from the Domain: "www.fixmytaxproblem.com." (*See* Am. Compl. ¶ 68.)  This website contains a subdomain, "www.fixmytaxproblem.com/liberty-tax-solutions-.html" (the "Subdomain"), (Am. Compl. ¶ 68–69), but Liberty Tax does not explain how a user would navigate from the website's home page to the Subdomain, (*id.*).  Liberty Tax attaches a copy of the Subdomain, which it last accessed on November 20, 2020. (*Id.* ¶ 68.)  Although the page displays a Whitewood logo in

4

the top left corner, it explicitly notes below the logo that "Your Liberty Tax Office Is Part Of The Whitewood Solutions Network So We Will Review All Of Your Clients['] IRS Notices At No Cost. Simply Complete The Form Below And Upload The Notice . . . We Will Handle The Rest!!!"  (Ex. 10 Am. Compl. 2, ECF No. 31-10.)

In addition to maintaining the Domain and Subdomain, Whitewood has created and continues to control two Whitewood Facebook pages. (Am. Compl. ¶¶ 51, 54.)  Liberty Tax attaches copies of these pages as they appeared on November 20, 2020. (*Id.* ¶¶ 51–52, 54, 56.) The first, titled "Whitewood Solutions" (the "2017 Facebook Page"), displays the Domain address prominently on the left side of the frame. (*Id.* ¶ 51; Ex. 4 Am. Compl. 2, ECF No. 31-4.) The 2017 Facebook Page's profile picture also depicts a large banner displaying a conspicuous Liberty Tax design mark. (Ex. 5 Am. Compl. 2, ECF No. 31-5.)  Beneath the mark, the banner reads in relevant part:  "Upgrade To A Liberty Tax Solutions Office." (*Id.*)  The banner further directs the reader to "Protect Yourself . . . Help Your Clients . . . [, and] Earn Year-Round Revenue." (*Id.*)  This page's most recent post dates back to July 20, 2017. (Ex. 4 Am. Compl. 2, ECF No. 31-4.)

The second page, titled "Whitewood Solutions – A Full Service Tax Resolution Company," (the "2020 Facebook Page") seems more active. (Am. Compl. ¶ 54–55.)  At the time Liberty Tax filed its Amended Complaint, the page had posted most recently on August 20, 2020. (Ex. 6 Am. Compl. 2, ECF No. 31-6.)  The 2020 Facebook Page contains a photo gallery with pictures that also depict conspicuous Liberty Tax marks, (Ex. 7 Am. Compl. 2–6, ECF No. 31-7), but the page does not link to the Domain, (Ex. 6 Am. Compl. 2, ECF No. 31-6.)  Liberty Tax also maintains that Branch, as Whitewood's CEO, "is responsible for, directs, or otherwise controls Whitewood's social media presence." (Am. Compl. ¶¶ 50–53, 55–56.)

5

Beyond the Facebook pages, Whitewood continues to distribute two pamphlets to prospective customers. (*Id.* ¶¶ 45–49.) Liberty Tax attaches the pamphlets and alleges that it last accessed them on November 20, 2020. (*Id.*; *see* Ex. 2 Am. Compl., ECF No. 31-2; Ex. 3 Am. Compl., ECF No. 31-3.) The first, a five-page "Tax and Financial Representation Engagement Agreement," displays a photo at the top of the first page featuring a Liberty Tax design mark. (Ex. 2 Am. Compl. 2, ECF No. 31-2.) Below the mark, the agreement reads: "STOP! This is ONLY for our ENTERPRISE PROGRAM participants whose clients have received their IRS Account Review Reports and wish to proceed with retaining you / us to handle the matter on their behalf." (*Id.*) It continues: "To Obtain a FREE Account Review Report for your client, you must go to the home page of www.libertycanhelp.com and click 'REFER A CLIENT' to complete the ARR enrollment agreement." (*Id.*) Finally, the pamphlet notes that the "agreement MUST have the Fees and Payment Terms section completed to be processed by Whitewood Solutions." (*Id.*) The second pamphlet, a two-page "Tax Resolution Referral Step-by-Step Guide," features the Whitewood logo at the top of both pages. (Ex. 3 Am. Compl. 2–3, ECF No. 31-3.) The first page of the document directs the reader to "Explain That Whitewood Solutions Is Liberty's TAX HELP PARTNER," and to "Have The Client Sit Down And Go To www.LibertyCanHelp.com." (*Id.*) Liberty Tax also claims that Branch himself, as CEO, "instruct[s] and direct[s]" Whitewood to steer consumers to the Domain with the pamphlets. (Am. Compl. ¶ 45.)

Liberty Tax further avers that Branch "previously falsely advertised a relationship between Whitewood and Liberty Tax" in a LinkedIn post which claimed that Whitewood was "changing the tax industry for the better by supporting Liberty Tax Service Franchisees." (*Id.* ¶¶ 70, 72.) Branch removed the post by the time Liberty Tax filed this suit. (*Id.* ¶ 71.)

6

Moreover, Liberty Tax claims that Branch registered "Liberty Tax Solutions, Inc." with Virginia's State Corporation Commission without Liberty Tax's permission in June 2017. (*Id.* ¶ 62.) It also alleges that Branch applied to register the Domain as a trademark of DM3 Ventures, but that he improperly indicated that the company did business as both "Whitewood Solutions *and* Liberty Tax Solutions." (*Id.* ¶ 61) (emphasis added).

On October 15, 2019, Liberty Tax sent Whitewood a cease and desist letter, contending that "Whitewood has registered and is using the domain name, www.libertycanhelp.com[,] without Liberty's authorization." (*Id.* ¶ 74; *see also* Ex. 11 Am. Compl. 2, ECF No. 31-11.) Whitewood responded six days later, acknowledging control over the Domain but "disclaim[ing] any potential consumer confusion." (Am. Compl. ¶ 75; *see also* Ex. 12 Am. Compl., ECF No. 31-12.)

### B.   Procedural Background

In March 2020, Liberty Tax filed its five-count Complaint in this Court. (ECF No. 1.) Two months later, Defendants filed their Motion to Dismiss. (ECF No. 17.) Liberty Tax filed a Motion for Preliminary Injunction, requesting that the Court enjoin Defendants from using the LIBERTY Marks or "any other marks that are confusingly similar to them." (Mot. Prelim. Inj. 1, ECF No. 19.) On November 6, 2020, this Court granted the Defendants' Motion to Dismiss, dismissing Liberty Tax's claims without prejudice, and denying Liberty Tax's request for a Preliminary Injunction. (Nov. 6, 2020 Order, ECF No. 30.) Two weeks later, Liberty Tax timely filed an Amended Complaint. (ECF No. 31.) The Amended Complaint asserts five counts against all Defendants, including Branch in his individual capacity:

> (I)    Trademark Infringement, in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114(1)(a) (Count I);

     (II)     Cybersquatting, in violation of the Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d) (Count II);

     (III)    False Designation of Origin, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1) (Count III);

     (IV)    Virginia Common Law Unfair Competition (Count IV); and,

     (V)     Virginia Trademark Infringement, in violation of Virginia Code § 59.1-92.12 (Count V).

(*See* Am. Compl. 18–24.) On December 4, 2020, Defendants filed the instant Motion to Dismiss. (ECF No. 32.) For the reasons that follow, the Court will deny the Motion to Dismiss Counts I and III through V against Whitewood. However, the Court will grant the Motion to Dismiss Counts I and III through V against Branch in his individual capacity and Count II against all Defendants, dismissing these claims with prejudice.

## II. Standard of Review

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990)). To survive Rule 12(b)(6) scrutiny, a complaint must contain sufficient factual information to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief.") Mere labels and conclusions declaring that the plaintiff is entitled to relief are not enough. *Twombly*, 550 U.S. at 555. Thus, "naked assertions of wrongdoing necessitate some factual enhancement within the complaint to cross the line between possibility and

8

plausibility of entitlement to relief." *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (internal quotation marks omitted).

A complaint achieves facial plausibility when the facts contained therein support a reasonable inference that the defendant is liable for the misconduct alleged. *Twombly*, 550 U.S. at 556; *see also Ashcroft v. Iqbal*, 556 U.S. 662 (2009). This analysis is context-specific and "requires the reviewing court to draw on its judicial experience and common sense." *Francis*, 588 F.3d at 193 (citation omitted). The Court must assume all well-pleaded factual allegations to be true and determine whether, viewed in the light most favorable to the plaintiff, they "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 676–79; *see also Kensington*, 684 F.3d at 467 (finding that a court in deciding a Rule 12(b)(6) motion to dismiss "'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff'" (quoting *Kolon Indus.*, 637 F.3d at 440)).

### III. Analysis

Defendants seek to dismiss all claims against each Defendant under Rule 12(b)(6). The Court first concludes that Liberty Tax sufficiently alleges that *some* of Whitewood's uses of Liberty Tax's marks—*i.e.*, linking to the Domain in the 2017 Facebook Page, incorporating the Domain into both pamphlets, and depicting the LIBERTY TAX word mark in the Subdomain—infringe on its trademarks because such uses are likely to confuse consumers. The Court also concludes, however, that Liberty Tax fails to aver sufficient nonconclusory facts to state trademark infringement claims against Branch in his individual capacity. Finally, the Court concludes that Liberty Tax has failed to state a claim under the ACPA because it insufficiently pleads that the Domain *itself* is confusingly similar to Liberty Tax's trademarks or that

9

Whitewood or Branch acted in bad faith. The Court begins with the claims against Whitewood for trademark infringement, false designation of origin, and unfair competition.

**A.     The Court Will Deny Whitewood's Motion to Dismiss Liberty Tax's Claims Against Whitewood for Lanham Act Trademark Infringement, Lanham Act False Designation of Origin, Virginia Unfair Competition, and Virginia Trademark Infringement with Regard to the 2017 Facebook Page, Both Pamphlets, and the Subdomain**

**1.     Legal Standard**

Liberty Tax brings four related claims against Whitewood:  trademark infringement under the Lanham Act (Count I), false designation of origin under the Lanham Act (Count III), unfair competition under Virginia common law (Count IV), and trademark infringement under Virginia state law (Count V).  (Am. Compl. ¶ 18–24.)  The Court will assess these together— referring to them collectively as "trademark infringement"—because they all involve "essentially identical" elements.  *Nationstar Mortg., LLC v. Ahmad*, 155 F. Supp. 3d 585, 592 (E.D. Va. 2015); *accord Lamparello v. Falwell*, 420 F.3d 309, 312 n.1 (4th Cir. 2005) (noting that a Virginia "unfair competition claim rises or falls [alongside] federal claims of infringement and false designation of origin."); *Am. Auto Ass'n v. AAA Auto Glass, LLC*, No. 1:14-cv-1072, 2015 WL 3545927, at *3 (E.D. Va. June 3, 2015) (noting that the Lanham Act's infringement standard is "essentially the same" as Virginia's state standard).

To state claims for trademark infringement, Liberty Tax must allege that:  (1) it possesses a trademark; (2) Whitewood used the mark; (3) Whitewood's use of the mark occurred "in commerce"; (4) Whitewood "used the mark 'in connection with the sale, offering for sale, distribution, or advertising' of goods or services"; and (5) Whitewood "used the mark in a manner likely to confuse consumers." *Lamparello*, 420 F.2d at 313 (quoting *People for the Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 364 (4th Cir. 2001)).  In order for a

party to "use" a mark and thereby satisfy the second element, courts require neither "precise[]" duplicat[ion]" nor "absolute identity." *Wash. Speakers Bureau, Inc. v. Leading Auths., Inc.*, 33 F. Supp. 2d 488, 497 (E.D. Va. 1999). Instead, when considering infringement claims, courts tend to presume that a defendant has used a plaintiff's mark if the use will likely confuse consumers. *Cf. Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1527 (4th Cir. 1984) (presuming that the defendant, Taco Uno, "used" the dominant word within with the plaintiff's, Pizzeria Uno, mark, "Uno").

Defendants do not contend that the Amended Complaint does not sufficiently allege elements one, three, and four. S*ee Cable News Network L.P., L.L.L.P. v. CNNews.com*, 177 F. Supp. 2d 506, 517 (E.D. Va. 2001) (noting that "the provision of news and information services on the Internet constitutes 'commerce' under the [Lanham] Act"), *aff'd in part and vacated on other grounds, Cable News Network, L.P., L.L.L.P. v. CNNews.com*, 56 F. App'x 599 (4th Cir. 2003); *see also* 15 U.S.C. § 1127 (noting that a party uses another's mark in commerce when the party uses or displays the mark "in the sale or advertising of service[s]," and the party offers those services in commerce). In addition, to the extent Whitewood argues that maintaining, registering, and linking to the Domain are not "use[s]" of Liberty Tax's marks as required by element two, (Def. Mem. Supp. 8, ECF No. 33), the Court will presume such uses do satisfy the second element insofar as they are likely to mislead. *See Pizzeria Uno Corp. v. Temple*, 747 F.2d at 1527. Thus, this Court need only consider the fifth element: whether Whitewood's use of Liberty Tax's marks will likely confuse consumers as to whether the two remain affiliated.

This element—likelihood of confusion—is the "touchstone" of the trademark infringement analysis, *Valador, Inc. v. HTC Corp.*, 241 F. Supp. 3d 650, 660 (E.D. Va. 2017), and prompts courts to consider "confusion not only as to source, but also as to affiliation,

11

connection[,] or sponsorship," *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 157 (4th Cir. 2012) (citing 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:8). "When dealing with domain names, . . . a court must evaluate an allegedly infringing domain name in conjunction with the content of the website identified by the domain name." *Passport Health, LLC v. Avance Health Sys., Inc.*, 823 F. App'x 141, 150 (4th Cir. 2020) (alterations omitted) (quoting *Lamparello*, 420 F.3d at 316). Therefore, "a court should not consider how closely a *fragment* of a given use duplicates the trademark, but must instead consider *whether the use in its entirety creates a likelihood of confusion*." *Id.*

Courts in the Fourth Circuit consider nine non-exhaustive and non-mandatory factors when determining likelihood of confusion:

> (1) the strength or distinctiveness of the plaintiff's mark as actually used in the marketplace; (2) the similarity of the two marks to consumers; (3) the similarity of the goods or services that the marks identify; (4) the similarity of the facilities used by the holder of the marks; (5) the similarity of advertising used by the holder of the marks; (6) the defendant's intent; (7) actual confusion; (8) the quality of the defendant's product; and[,] (9) the sophistication of the consuming public.

*Id.* at 147 (quoting *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 660 (4th Cir. 2018)). These factors do not function as a "rigid formula," but instead only "guide" courts' discussions of the issue. *Anheuser-Busch, Inc. v. L & L Wings, Inc.*, 962 F.2d 316, 320 (4th Cir. 1992).

Indeed, not every factor is relevant in all cases. *Rosetta Stone Ltd.*, 676 F.3d at 154. The specific facts here diminish the importance of the first, second, and fifth factors, as consumers will already know *which* "Liberty" to which the Domain may be referring. Nor is the fourth germane, as this case centers around online commerce. Finally, Liberty Tax has not alleged enough nonconclusory facts for the Court to evaluate the sixth, seventh, and eighth factors.

Accordingly, on the facts alleged, only the third factor (similarity of services offered) and ninth factor (sophistication of the consuming public) warrant discussion.

> **2.      Liberty Tax Sufficiently Alleges That Whitewood's Use of the Domain Within Its 2017 Facebook Page Will Likely Confuse Consumers**

The Court begins by considering the third factor—the similarity between the parties' services. *Passport Health,* 823 F. App'x at 147. The relevant factors, alongside the unique facts of this case, illustrate that the 2017 Facebook Page may confuse consumers.[10]

Here, the similarity between the services Liberty Tax and Whitewood offer suggests that consumers may likely think the two remain affiliated. Liberty Tax alleges that it offers services for both "tax preparation" (assisting taxpayers with their tax returns) and "tax resolution" (assisting individuals who face delinquent tax debt). (Am. Compl. ¶ 36.) The parties agree that Whitewood also provides tax resolution services. (Am. Compl. ¶ 37.) As such, accepting Liberty Tax's allegations as true, the parties' tax resolution services compete with each other. "[T]here is [thus] no substantial difference between the [parties' services] that would serve to ameliorate any confusion of their marks." *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 466 (4th Cir. 1996); *accord Nationstar Mortg., LLC,* 155 F. Supp. 3d at 591 ("[w]here the

_____

[10] The Court, however, reiterates its conclusion from its prior opinion: Liberty Tax has not alleged sufficient facts to demonstrate that the Domain itself, analyzed alongside its content, is likely to confuse consumers as to whether Liberty Tax and Whitewood are still affiliated. *JTH Tax LLC v. DM3 Ventures, Inc.*, No. 3:20-cv-176, 2020 WL 6551214, at *6–7 (E.D. Va. Nov. 6, 2020). The Domain immediately redirects users to "yourtaxhelpteam.com," a site that "explicitly identifies" Whitewood as the service provider; prominently displays Whitewood logos; and does not otherwise advertise any association with Liberty Tax. *Id.* at 7. The inclusion of the Subdomain does not alter the Court's conclusion because the Subdomain is located within a *separate* website, "www.fixmytaxproblem.com." (Am. Compl. ¶ 68.) Thus, "evaluat[ing] [the] allegedly infringing domain name in conjunction with the content of the website," *Passport Health, LLC*, 823 F. App'x at 150, the Court again concludes that Whitewood's registration and maintenance of the Domain, without more, do not infringe on any of Liberty Tax's marks.

13

[p]laintiff and [d]efendant provide the same services, th[is] factor weighs heavily in favor of a likelihood of confusion.") (citing *Bros. of the Wheel M.C. Exec. Council, Inc. v. Mollohan*, 609 Fed. App'x 149 (4th Cir. 2015) (per curiam)); *Commc'ns Satellite Corp. v. Comcet, Inc.*, 429 F.2d 1245, 1253 (4th Cir. 1970) (noting that distinct but "complementary" services "are particularly vulnerable to confusion").[11]

Turning to the ninth factor—sophistication of the consuming public, *Passport Health*, 823 F. App'x at 147—the Court concludes that this element tips in neither party's favor. "If the typical consumer in the relevant market is sophisticated in the use of—or possesses an expertise regarding—a particular product, such sophistication or expertise may be pertinent in determining the likelihood of confusion." *Sara Lee Corp.*, 81 F.3d at 467 (citing *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 127–28 (4th Cir. 1990)). However, "buyer sophistication will only be a key factor when the relevant market is not the public at large." *Id.*; *see Select Auto Imports Inc. v. Yates Select Auto Sales, LLC*, 195 F. Supp. 3d 818, 840 (E.D. Va. 2016) (finding this factor "neutral" when the relevant consumer base was the general automobile-purchasing public). Here, the Court likewise finds this factor to be neutral, as the 2020 Facebook Page demonstrates that Whitewood's social media presence targets the general consuming public and not merely Liberty Tax franchisees like Whitewood argues. (Def. Mem. Supp. 11, ECF No. 33.) For instance, an August 20, 2020 post on the page reads: "If *you* find *yourself* in trouble or

---

[11] Whitewood counters that Liberty Tax has only "very recent[ly]" begun to offer tax resolution services," and that it "is [more] traditionally in the business of furnishing tax preparation and filing services." (Def. Mem. Supp. 3, ECF No. 33.) Even if the Court credited this extra-pleading contention—and even if that affected which services consumers generally associated with Liberty Tax—Liberty Tax has still alleged that the parties offer, at the very least, complementary services (*i.e.*, tax preparation and tax resolution). Indeed, Whitewood itself admits that the parties' services "are as compl[e]mentary as bread and water." (Def. Reply to Pl.'s Opp. 4, ECF 42.) This factor thus still weighs in favor of confusion, regardless of whether the parties' services compete with or complement each other.

confused by something *you* receive from the IRS . . . give us a call . . . ." (Ex. 6 Am. Compl. 2, ECF No. 31-6) (emphasis added). In addition, several of the page's photos depict a man with a sign taped to his back that reads: "YOU OWE THE IRS $$$," while another photo directs the reader to "File a tax extension and relax." (Ex. 7 Am. Compl. 3, ECF No. 31-7.) This factor thus weighs in neither party's favor.

Looking beyond the enumerated factors, the Court notes that the specific facts of this case suggest a tendency to mislead consumers. *See Rosetta Stone Ltd.*, 676 F.3d at 154 (noting that the factors are "not . . . mandatory"). The 2017 Facebook Page's profile photo depicts a large banner which reads: "Upgrade To A Liberty Tax Solutions Office." (Ex. 5 Am. Compl. 2, ECF No. 31-5.) Above this text is a conspicuous duplication of a Liberty Tax design mark. *Id.*[12] And directly below the profile photo, Whitewood links to "Libertycanhelp.com." (Ex. 4 Am. Compl. 2, ECF No. 31-4.) A consumer who accesses this Facebook page, sees the profile photo displaying the Liberty Tax word and design marks, and clicks on the link may still be confused as to whether Liberty Tax and Whitewood remain affiliated with one another, particularly because Whitewood's site does not expressly disclaim current association with Liberty Tax.

Whitewood argues that the 2017 Facebook Page likely does not confuse consumers because it "was created on July 20, 2017, the first and only profile picture was uploaded on July 20, 2017 . . . , [and] the last of the only two posts was uploaded on July 20, 2017." (Def. Mem. Supp. 10, ECF No. 33.) At this juncture, this does not persuade. To survive a motion to dismiss, Liberty Tax need only *allege* that Whitewood's use of Liberty Tax's mark is likely to confuse—

---

[12] To be clear, Liberty Tax does not seem to claim that Whitewood's uses of its marks in its Facebook photos are distinct instances of trademark infringement, as these uses likely stemmed from the parties' prior business relationship. (Am. Compl. ¶ 53 (taking issue only with Whitewood's continued use of the Domain "together with images that utilize the LIBERTY Marks, all alongside Whitewood's name").)

it does not need to *prove* so. *Twombly*, 550 U.S. at 556. Likelihood of confusion is an "'inherently factual' issue," *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d at 933 (quoting *Anheuser-Busch*, 962 F.2d at 318). Accordingly, courts hesitate to dismiss trademark infringement claims at the Rule 12(b)(6) stage.

The Court concludes that Liberty Tax has indeed alleged, with the requisite accompanying facts, that "Whitewood's continued use of the [Domain] on [the 2017] Facebook [P]age, together with images of the LIBERTY marks, all alongside Whitewood's name, is likely to cause consumers to believe that there is an affiliation . . . between Liberty Tax and Whitewood" even though the parties have no such affiliation. (Am. Compl. ¶ 53.)

**3.     Liberty Tax Sufficiently Alleges That Whitewood's Use of Liberty Tax Marks in Its Promotional Pamphlets and the Subdomain Are Likely to Confuse**

Liberty Tax has also alleged enough facts to state claims for trademark infringement in several other respects: Whitewood's use of the Domain in the two pamphlets, and Whitewood's use of the LIBERTY TAX word mark within the Subdomain.

All three uses suggest a tendency to mislead. Liberty Tax challenges two pamphlets. As to the first pamphlet, the initial page displays a Liberty Tax logo and word mark at the top of the page and directs the reader to "go to the home page of www.libertycanhelp.com." And at the bottom, it notes that Whitewood will process the agreement referenced in the pamphlet. For the same reasons the 2017 Facebook Page is likely to confuse consumers—*i.e.*, explicit use of Liberty Tax marks in conjunction with the Domain and a lack of disclaimer of affiliation—the first pamphlet likewise seems to suggest that Liberty Tax and Whitewood are still affiliated. That is sufficient to state an infringement claim.

The second pamphlet suggests a similar tendency to mislead. Although it does not display any Liberty marks—instead depicting a prominent Whitewood logo—it plainly instructs the reader to "Explain [to his or her client] That Whitewood Solutions Is Liberty's TAX HELP PARTNER." (Ex. 3 Am. Compl. 2, ECF No. 31-3.) Only three lines below, the pamphlet directs the reader to "Have The Client Sit Down And Go To www.LibertyCanHelp.com." (*Id.*)

The next challenged use—the Subdomain—also offends. The Subdomain clearly advertises that the reader's "Liberty Tax Office Is Part Of The Whitewood Solutions Network . . . ." (Ex. 10 Am. Compl. 2, ECF No. 31-10.) It further notes that because the two are affiliated, Whitewood will review the IRS notices of the reader's clients free of charge. *Id.* Such clear statements of partnership suffice to allege that the Domain's inclusion on the pamphlets, and the Subdomain's use of Liberty Tax's word mark, are "likely to cause consumers to believe that there is an affiliation . . . between Liberty Tax and Whitewood" even though the parties maintain no such affiliation. (Am. Compl. ¶ 49.)

Whitewood correctly avers that the pamphlets seem to exclusively target Liberty Tax franchisees—and indeed, Liberty Tax does not respond otherwise. (Def. Mem. Supp. 13, ECF No. 33.) Yet Whitewood fails to argue why, as a matter of law, franchisees would categorically know of the relationship between Liberty Tax and another business partner at any given period of time. *See* (*id.*) Consequently, at this stage, the court finds that Liberty Tax has successfully stated a claim that the pamphlets and Subdomain are likely to confuse consumers and thereby infringe on their trademarks. Accordingly, the Court will deny Whitewood's Motion to Dismiss Counts I and III through V against Whitewood as they relate to the 2017 Facebook Page, both pamphlets, and the Subdomain.

17

**B.     The Court Will Grant the Motion to Dismiss Liberty Tax's Four Trademark Infringement Claims Against Branch in His Individual Capacity Because Liberty Tax Fails to Allege Specific, Non-Conclusory Facts Showing Personal Wrongdoing**

Despite amending its Complaint to include facts that sufficiently allege trademark infringement claims against *Whitewood*, Liberty Tax still fails to present anything more than conclusory allegations as to why this Court should hold *Branch* liable for infringement in his individual capacity.  It is true that "an officer of a corporation can be held personally liable for his own conduct in infringing on another's trademark." *Life Techs. Corp. v. Govindaraj*, 931 F.3d 259, 266 (4th Cir. 2019).  But here, Liberty Tax merely asserts several times that "[o]n information and belief, Branch has instructed and directs Whitewood" to commit an infringing act. *See, e.g.*, (Am. Compl. ¶ 45.)  Indeed, Liberty Tax includes only three specific allegations regarding Branch in its Amended Complaint:  that he applied to register the Domain as a trademark, (*id.* ¶ 59); that he registered "Liberty Tax Solutions, Inc." with Virginia's State Corporation Commission in June 2017 without Liberty Tax's permission, (*id.* ¶ 62); and that he previously stated on LinkedIn that Whitewood was "changing the tax industry for the better by supporting Liberty Tax Service Franchisees," (*id.* ¶ 71.)  Even taking these allegations as true, Liberty Tax still has not specifically set forth how or why Branch—the company's CEO—directed the company to include a specific link on a Facebook Page or promotional pamphlets. The Court declines to accept Liberty Tax's formulaic recitation of corporate officer liability's elements.  Accordingly, the Court will grant Whitewood's motion to dismiss all trademark infringement claims against Branch in his individual capacity.

C. **The Court Will Grant the Motion to Dismiss the ACPA Claim Against Whitewood and Branch Because Liberty Tax Fails to Allege That the Domain is Confusingly Similar to Liberty Tax's Marks and That Whitewood Acted in Bad Faith**

Finally, the Court will grant Whitewood's Motion to Dismiss Liberty Tax's Anticybersquatting Consumer Protection Act claim (Count II) against Whitewood and Branch because Liberty Tax fails to allege two necessary elements.

1. **Legal Standard**

Congress enacted the ACPA to prevent parties from, among other things, registering "well-known marks to prey on consumer confusion by misusing the domain name to divert customers from the mark owner's site to the cybersquatter's own site.'" *Lamparello*, 420 F.3d at 318 (quoting S. Rep. No. 106-140, 1999 WL 594571, at *5–6). To state a claim under the ACPA, Liberty Tax must allege that: (1) it owns a protected mark; (2) the Domain is identical or confusingly similar to Liberty Tax's marks; and, (3) Whitewood used the Domain with the bad faith intent to profit from Liberty's marks. *People for the Ethical Treatment of Animals*, 263 F.3d at 367 (citing 15 U.S.C. § 1125(d)(1)(A)). Similar to the Fourth Circuit's confusion analysis, the ACPA provides courts with nine non-exhaustive and non-mandatory factors to examine when considering bad faith.[13] On the facts alleged here, however, Liberty Tax has

---

[13] These factors are:

[1] the trademark or other intellectual property rights of the person, if any, in the domain name; [2] the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person; [3] the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services; [4] the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name; [5] the person's intent to divert customers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or

19

shown neither that the Domain is confusingly similar to Liberty Tax's marks, nor that

Whitewood acted in bad faith.

### 2. Liberty Tax Insufficiently Alleges That the Domain Is Confusingly Similar to Liberty Tax's Marks

Liberty Tax fails to allege in its Amended Complaint that the Domain name itself,

"www.libertycanhelp.com" is confusingly similar to Liberty Tax's marks. It has not explained

how, for instance, the Domain will trick consumers into visiting Whitewood's site. Nor has it

alleged that consumers are likely to enter "www.libertycanhelp.com" directly into a search bar,

or that consumers who come across the domain will be confused. To be sure, Liberty Tax

adequately alleges that Whitewood's inclusion of the Domain *alongside other references to*

*Liberty Tax* will likely mislead consumers. But it does not clarify why the name

"libertycanhelp.com," by itself, will confuse consumers as to the site's source. *Cf. Lamparello,*

---

endorsement of the site; [6] the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct; [7] the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct; [8] the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and [9] the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c).

15 U.S.C. § 1125(d)(1)(B); *see Valador, Inc.*, 241 F. Supp. 3d at 672 ("[T]he first four factors suggest circumstances that may tend to indicate an *absence* of bad faith intent to profit," while "[t]he final five factors 'suggest circumstances that may tend to indicate that such bad-faith [intent to profit] exists'" (third alteration in original) (quoting *Lamparello*, 420 F.3d at 319)).

420 F.3d at 318–21 (discussing an ACPA claim asserted by Reverend Jerry Falwell against owners of the site "fallwell.com," which included an additional "l" in its name). Such a failure is fatal to Liberty Tax's ACPA claim.

### 3.    Liberty Tax Insufficiently Alleges Whitewood or Branch Acted in Bad Faith

Liberty Tax's Amended Complaint does not indicate that Whitewood and Branch acted with bad faith intent to profit from Liberty's marks. *See Harrods v. Sixty Internet Domain Names*, 302 F.3d 214, 234 (4th Cir. 2002) (summarizing the issue as "whether or not the defendant registered, trafficked in, or used the domain name with a bad-faith intent to profit from the goodwill of the mark of another" (quoting 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 20:82)). In particular, the third factor (Whitewood's use of the Domain in connection with bona fide services), strongly suggests that Whitewood seeks to legitimately maintain the Domain instead of merely possessing it with the intent to sell it or misdirect consumers. The Domain now redirects users to "www.yourtaxhelpteam.com," (Am. Compl. ¶ 44), through which Whitewood offers its own tax resolution services. In other words, Whitewood is not necessarily "squatting" on the Domain. *Cf. Prudential Ins. Co. of Am. v. PRU.COM*, No. 1:20-cv-450, 2021 WL 2744526, at *6 (E.D. Va. June 30, 2021) (concluding that this factor indicated bad faith because the defendant had not "develop[ed]" the website to any substantial degree).

The fourth factor (noncommercial or fair use of the mark) does not pertain here. But the fifth (intent to divert customers away from the mark owner's site) does not support the reasonable inference that Whitewood and Branch acted in bad faith. Liberty Tax fails to contend, beyond conclusory references to "intent," *e.g.*, (Am. Compl. ¶ 86), that Whitewood and Branch aim to divert customers away from Liberty Tax's services to their own. While Liberty

Tax does aver that Whitewood "still advertise[s] and direct[s] customers to its website using the [Domain] in [its] pamphlets," (Am. Compl. ¶ 45), it does not allege that Whitewood does so *with the intent to profit* from misdirected consumers or from selling the domain to Liberty Tax. Even presuming some profit has occurred or may occur, that the Domain itself is *not* confusingly similar to Liberty Tax's marks buttresses the point that Whitewood does not seek to profit from consumer confusion.

Likewise, the sixth, seventh, and eighth factors (the owner's offer to sell the site, the owner's inclusion of false or misleading information on the domain registration, and the owner's registration of multiple similar domain names) do not suggest bad faith here. Liberty Tax does not contend that Whitewood or Branch offered to sell or otherwise transfer the Domain to Liberty Tax for financial gain, nor does it suggest that Whitewood sought to induce Liberty Tax to purchase it. *Cf. Prudential*, 2021 WL 2744526, at *9 (noting that the record clearly established that the defendant used the domain "in order to secure an offer to purchase [the] domain for a substantial sum"). Nor does Liberty Tax contend that Whitewood or Branch provided false or misleading contact information when applying to trademark the Domain. *See* (Am. Compl. ¶¶ 59–63.)[14] Finally, Liberty Tax does not aver that Whitewood or Branch acquired any similar domains.

---

[14] The Court notes that Liberty Tax argues that the application improperly identified DM3 Ventures as doing business as "Whitewood Solutions *and* Liberty Tax Solutions," (Am. Compl. ¶ 61) (emphasis added). Liberty Tax may take issue with whether DM3 Ventures can, as a matter of trademark law, legitimately do business as "Liberty Tax Solutions." However, Liberty Tax admits that Liberty Tax Solutions is a legally registered Virginia corporation and that Branch is its registered agent. (Am. Compl. ¶ 6.) In other words, stating that DM3 Ventures did business as "Whitewood Solutions and Liberty Tax Solutions" was not an attempt to "conceal the true identity of [a] cybersquatter." *Prudential*, 2021 WL 2744526, at *9.

The Court recognizes that the first, second, and ninth factors (the trademark rights Whitewood possessed in the Domain before registering it, the extent to which the Domain's name is used to commonly identify Whitewood, and the distinctiveness of Liberty Tax's mark) tip toward Liberty Tax in this bad faith analysis. *See Prudential*, 2021 WL 2744526, at *6 (noting that the first factor considers intellectual property rights in the domain name "at the time of registration"); (Am. Compl. ¶ 59) (noting that Whitewood sought to trademark the Domain in 2019, years after it registered the Domain).  Nevertheless, the clear weight of the factors instructs that these facts, even viewed favorably, cannot give rise to the reasonable inference that Whitewood or Branch registered or maintained the Domain with the bad faith intent to profit from it.  Accordingly, the Court will grant Whitewood's motion to dismiss Liberty Tax's ACPA claim against all Defendants.

### IV. Conclusion

For the foregoing reasons, the court will deny the Motion to Dismiss as to Counts I and III through V against Whitewood, but will grant the Motion to Dismiss as to Count II against all Defendants and all counts against Branch in his individual capacity.  To the extent the Court dismisses Liberty Tax's claims, the Court dismisses those claims with prejudice.

An appropriate order shall issue.

Date: 9-29-21
Richmond, Virginia

_____
M. Hannah Lauck
United States District Judge